UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

**JODI OSBORN,**
    **PLAINTIFF**

VS.

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**
    **DEFENDANT**

**CASE NO. 1:09CV0493**
**(DLOTT, J.)**
**(HOGAN, M.J.)**

### REPORT AND RECOMMENDATION

Plaintiff, a 39 year-old woman with Lupus, filed her application for Social Security Disability Insurance benefits in October, 2005. Her application was denied, both initially and upon reconsideration. Plaintiff then requested and obtained a hearing before an Administrative Law Judge (ALJ) in October, 2008 at Cincinnati, Ohio. Plaintiff, who was represented by counsel, testified as did Vocational Expert (VE) George Parsons. The ALJ reached an unfavorable decision in November, 2008 and Plaintiff then processed an appeal to the Appeals Council, which denied review in May, 2009. Plaintiff filed her Complaint with this Court in July, 2009.

### STATEMENTS OF ERROR

Plaintiff asserts that the ALJ erred by concluding that she did not meet Listings 14.02 and 8.07 dealing with Lupus and Genetic Photosensitivity Disorders. She also claims that the ALJ erred in failing to consider vocational expert testimony on sustainability of work and the opinion of treating physician Hana Badreddine, M.D.

### PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that she lived with her husband and four children in Colerain Township,

Ohio. She testified that she has a bachelor's degree in English, has a valid drivers license, and is 5'1" tall and weighs 118 lbs. Her prior employment was as a sales clerk at Walden Books, telemarketer at Omni Equipment, cashier at a health food store, librarian at Mississippi State and secretary at Mississippi Department of Finance.

She currently works at Ohmart Corporation, doing data entry work, and has since September, 2007. She is seeking a closed period of disability with an onset date of May 2, 2004.

When asked why she couldn't work during the closed period, ending on September 9, 2007, Plaintiff said that she had an extreme sensitivity to flourescent light and natural sunlight and worked for 7 months with the Bureau of Vocational Rehabilitation before she found an accommodating employer, Ohmart Corporation, which "changed the lighting in her cube," furnished a foot rest to increase the circulation in her legs and permits her to change positions. She earns $15 per hour at Ohmart. She was diagnosed with Lupus in 1987 when she was a junior in high school.

Plaintiff testified that she can tolerate flourescent light between 20 minutes to 120 minutes, that the consequences are burning skin, blisters on the tips of her fingers and toes, joint pain and fever. The blisters can last for 6 weeks. She copes by avoiding direct sunlight and flourescent light, using dark shades in her home, using a protective coating on her clothes and tinting her car windows, the purpose for which is to protect her from UV ray penetration. She takes Prednisone and Plavix to treat flare-ups, which occur less in the spring and fall and more in the summer and winter, when the temperature is more extreme.

She suffers from morning stiffness "a few times a month" and has been late for work 3-4 times per month. The stiffness lasts for about 1 hour. Her current employer provides her with a foot rest to elevate her legs at waist level every 20 minutes, a filter to reduce UV rays from her computer screen and permits a sit/stand option.

Plaintiff estimated that she could sit for 1/2 hour, stand for 1/2 hour and walk for 35-40 minutes. She can lift 10-15 lbs. when not suffering from a flare-up. During the closed period from May 2, 2004 to September 9, 2007, she was hospitalized or treated in the emergency room 3-4 times. During the closed period, she suffered from chronic fatigue and her legs "gave out" on a daily basis (Tr. 373-393).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The first hypothetical question asked the VE to assume that Plaintiff had to avoid exposure to fluorescent light, presumably during working hours. The VE identified the job of security monitor at the sedentary and unskilled level, movie usher or ticket taker at the light and unskilled level, data entry jobs at the sedentary and presumably semi-skilled level.

The second hypothetical, eventually accepted by the ALJ, added to the limitations of the first that Plaintiff must avoid temperature extremes. The VE indicated that the number of jobs would not be diminished as most are in "controlled environments."

The VE further testified that employers tolerate 3 absences per month, but would not tolerate calling in at the last minute with sudden-arising health issues. The VE testified that if Plaintiff had to elevate her legs throughout the day on an unscheduled or irregular basis, "it would become a nuisance." The VE further testified that requiring a sit/stand option would not reduce the number of available jobs, but that having blisters on her hands for a 6-week period would "seriously erode the number of jobs" and render her unemployable. (Tr. 393-401).

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff has systemic lupus erythematosus and that the impairment was severe, but did not meet or equal any Listing. The ALJ found that Plaintiff had the residual functional capacity to perform work at all exertional levels, but must avoid fluorescent lights and temperature extremes. The ALJ found that during the closed period, Plaintiff could not return to her past relevant work, but could perform a number of jobs, all of which exist in representative numbers in the national economy. The ALJ found Plaintiff to be not disabled during the closed period for which she sought benefits.

## THE MEDICAL RECORD

Plaintiff was admitted to a Mississippi hospital in March, 2001 for the birth of her second

child, a boy. Chester Lott, M.D., reported that Plaintiff had been diagnosed with Lupus at age 17, but had no flare-ups during her pregnancy. The birth was uneventful. (Tr., Pg, 132). Plaintiff was admitted to the same hospital in January, 2003 for the birth of a female child. Thomas Pearson, M.D., reported that Plaintiff had a history of Lupus, and had "mild anemia," but both baby and mother did well. (Tr. 137). She returned to the hospital 8 days later with abdominal pain, "severe anemia" and endrometritis. She received two units of blood and was given antibiotics. (Tr., Pgs 138-139). Her symptoms upon admission included a high fever and severe anemia, thought to be caused by "septic pelvic thrombophlebitis." (Tr. 140-144). Consultation with Linda Rockhold, M.D., Plaintiff's rheumatologist, resulted in the advice that Plaintiff's fever could have been the result of a Lupus flare-up. She was discharged after a normal white count, a negative echocardiogram and a negative CT scan of the pelvis. (Tr. 146-150).

In October, 2001, Linda Rockhold, M.D., reported that Plaintiff has systemic Lupus and has an extreme sensitivity to light. "She is unable to tolerate sun exposure or even intensive fluorescent light exposure." (Tr. 136).

The Discharge Summary related to a hospitalization in February, 2003 for right-sided chest pain, especially upon deep breathing. A CT scan of her chest showed a "large, right-sided pulmonary embolus," which was anticoagulated with Heparin. The clot was located in the inferior vena cava. She was treated with antibiotics and multi-vitamins as well as Coumadin and released after a 6-day stay. (Tr. 152-157).

An office note from Michael Anthony, M.D., in May of 2003 indicated that Plaintiff was there for a follow-up visit relative to her previous problems with Lupus, anemia and her embolus. Dr. Anthony reported that her systemic Lupus was "well-controlled." Coumadin therapy was stopped. (Tr. 210). In December, 2001, Dr. Anthony saw Plaintiff for a flare-up of her Lupus. She was sufferening from a fever and body aches. Biaxin XL was prescribed along with an iron tablet for anemia. (Tr. 213). In September, 2001, Dr. Anthony decreased her dosage of Prednisone and noted that joint swelling had improved. (Tr. 214). In September, 2001, Dr. Anthony treated Plaintiff for a Lupus flare-up, a rash, joint swelling and diarrhea. Dr. Anthony, Plaintiff's primary care physician, referred her to Dr. Rockhold, a rheumatologist. (Tr. 215).

A CT scan of Plaintiff's chest in February, 2003 showed "a small residual pulmonary

4

embolism in the right lower lobe and a small amount of residual thrombus in the inferior vena cava." (Tr. 216). A CT scan of the brain was normal. (Tr. 217). A venous ultrasound of both legs, also in February, 2003, showed "normal venous flow." (Tr. 219). An x-ray of the lateral chest in February, 2003 showed "infiltrate in the right lower lobe with probable small right pleural effusion" (Tr. 224).

In March, 2003, Andrew Kellum, M.D., reported to Dr. Anthony that Plaintiff was seen for a pulmonary embolism and vena cava clot and responded well to anticoagulant therapy. The recommendation was that she remain on anticoagulant therapy for a period of six months and take an iron supplement for anemia. (Tr. 225).

Plaintiff was seen in the emergency room at Bethesda Hospital for fever and pain in the left lower quadrant in May, 2004. She was reported to have Lupus and the last flare-up was three years ago. After testing to determine the causes of the fever and quadrant pain, it was concluded that Plaintiff's Lupus results in an extreme photosensitivity to light, which in turn results in fever, rashes and various myalgias. (Tr. 246).

Hana Baddredine, M.D., reported that she saw Plaintiff from February to July, 2006, that she has had systemic Lupus since age 17 and that the symptoms resulting from the disease are photosensitivity, skin rash, lesions on the hands, chronic fatigue, mouth sores and flu-like symptoms such as fever, joint pain and diarrhea (Tr. 269-318).

Plaintiff saw Robert Corgan, M.D., in the emergency room at Bethesda Hospital in January, 2008 for a rash on her upper back, chest and arm. Dr. Corgan thought the rash was "a reactive process." She was discharged after the resolution of a subsequent adverse reaction to Vancomycin. (Tr. 319-320).

Dr. Badreddine reported in July, 2008 that her patient has Lupus and a history of postpartum embolism, treated with Coumadin. Dr. Baddredine described Plaintiff's sensitivity to light as "significant" and said that it caused flare-ups resulting in a rash, pain and joint swelling, Plaintiff has "done reasonably well when she has avoided exposure to fluorescent light." (Tr. 322). In January, 2008, Dr. Baddredine reported that she saw Plaintiff for a painful rash on her arms and chest, lesions on her fingers, but no joint pain mouth sores or difficulty breathing. Dr. Baddredine thought she had shingles. (Tr. 349-350).

## OPINION

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the

Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits. If plaintiff's impairment or combination of impairments is medically equivalent to one in the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b).

If plaintiff's alleged impairment is not listed, the Commissioner will decide medical equivalence based on the listed impairment that is most similar to the alleged impairment. 20 C.F.R. § 404.1526(a). If plaintiff has more than one impairment, and none of them meet or equal a listed impairment, the Commissioner will determine whether the combination of impairments is medically equivalent to any listed impairment. *Id.*

The grid is designed for use when the alleged impairment manifests itself through limitations in meeting the strength requirements of jobs. 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). If plaintiff suffers solely from nonexertional impairments, the grid is inapplicable and the Commissioner must rely on other evidence to rebut plaintiff's prima facie case of disability. *Id.*,

§ 200.00(e)(1). Nonexertional impairments include "certain mental, sensory, [and] skin impairments" as well as "postural and manipulative limitations [and] environmental restrictions." 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). Where a plaintiff suffers from an impairment or a combination of impairments that results in both exertional and nonexertional limitations, the grid is consulted to see if a finding of disability is directed based upon the strength limitations alone. If not, the grid is then used as a framework and the Commissioner examines whether the nonexertional limitations further diminish plaintiff's work capability and preclude any types of jobs. *Id.,* § 200.00(e)(2). If an individual suffers from a nonexertional impairment that restricts performance of a full range of work at the appropriate residual functional capacity level, the Commissioner may use the grid as a framework for a decision, but must rely on other evidence to carry his burden. *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990); *Damron v. Secretary of H.H.S.*, 778 F.2d 279, 282 (6th Cir. 1985); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528-29 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). The existence of a minor nonexertional impairment is insufficient to preclude use of the grid for directing a decision. Rather, plaintiff must demonstrate that the nonexertional impairment "significantly limits" his ability to do a full range of work at the appropriate exertional level in order to preclude a grid based decision. *Atterberry v. Secretary of H.H.S.*, 871 F.2d 567, 572 (6th Cir. 1989); *Cole v. Secretary of H.H.S.*, 820 F.2d 768, 771-72 (6th Cir. 1987); *Kimbrough v. Secretary of H.H.S.*, 801 F.2d 794, 796 (6th Cir. 1986).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson v. Secretary of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). Taking notice of job availability and requirements is disfavored. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 536-37 n.7, 540 n.9 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson*, 735 F.2d at 964; *Kirk*, 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's

individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980)(citing *Taylor v. Weinberger,* 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born v. Secretary of H.H.S.,* 923 F.2d 1168, 1174 (6th Cir. 1990); *Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). See also *Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the

Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

In order to meet Listing 14.02(B), one must first demonstrate Systemic Lupus Erythematosus, described in 14.00(B)(1) as a "disease characterized clinically by constitutional symptoms and signs, such as fever, fatigability, malaise, weight loss, multisystem involvement and frequently anemia, leukopenia or thrombocytopenia." In order to meet the additional requirements of Listing 14.02(B), Plaintiff must show an involvement of two or more organs/body systems (joint, muscle, ocular, respiratory, cardiovascular, digestive, renal, hematologic, skin neurological or mental) at least one of which must be involved to at least a moderate level of severity. In addition, Plaintiff must show significant, documented constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss.
Since Plaintiff seeks a closed period of disability, she must, of course, show that the above criteria occurred during the closed period from May 2, 2004 to September 9, 2007.

Plaintiff has established beyond question that she has Lupus. She testified at the hearing and provided a history to a number of physicians that she was first diagnosed at age 17. Dr. Lott recorded that she had anemia, stomach pain and fever, all symptoms of Lupus in 2001. Dr. Rockhold, a rheumatologist, advised Dr. Lott that Plaintiff's fever could have been the result of a Lupus flare-up. Dr. Rockhold diagnosed Plaintiff with Lupus and observed in 2001 that she had an extreme sensitivity to light. Dr. Anthony treated Plaintiff for Lupus in 2003 and treated various Lupus-like symptoms, such as fever, body aches, anemia, joint swelling and a rash. Hospitalization at Bethesda Hospital in 2004 was for fever, rash, myalgias and sensitivity to

light-all symptoms of Lupus. Dr. Baddredine, also a rheumatologist, agreed with the diagnosis of Lupus and treated Plaintiff's symptoms, including chronic fatigue, mouth sores and lesions on her hands, also all symptomatic of Lupus. There is, in short, voluminous evidence that Plaintiff suffered, before, after and during the closed period, with Lupus and no evidence to the contrary.

Listing 14.02(B) requires that in addition to the diagnosis of Lupus, Plaintiff must show that the disease involves two or more organs or body systems and that one is affected to at least a moderate degree. Even a quick reading through Plaintiff's medical history would show that the most significant impact of the disease upon her life, work or otherwise, is her need to avoid natural sunlight and fluorescent light for any significant period of time. The medical record shows that she is presently able to work because of the accommodations designed by a rehabilitation engineer, whose recommendations were accepted and acted upon by her employer, Ohmart. The steps Ohmart took were to remove sources of fluorescent lighting, shade windows from natural sunlight and install a computer screen to reduce UV rays. Although there is no residual functional impairment analysis by any physician, we regard it as obvious that the sensitivity to light created at least a moderate limitation of Plaintiff's ability to both work and live and did so within the closed period.

Although Plaintiff makes an argument that multiple body systems were involved, the Listing requires only two and the next most significant appears to be joint pain and swelling, an obstacle Plaintiff encountered on multiple occasions, both during the closed period in May, 2004, February, 2006 and multiple times in 2007 and beyond.

In addition, the Listing requires that Plaintiff show documented constitutional symptoms of severe fatigue, fever, malaise, and weight loss. The record shows the presence of all these required symptoms, but none to the required level. See, for example, the references from Dr. Badreddine at Tr. 270, 271, Dr. Fabrey at Tr. 317 and Plaintiff at Tr. 392, all of which show chronic, but not severe, fatigue. The presence of fever was relatively constant, but not to any extreme degree and malaise and some weight loss were mentioned even less frequently. Our conclusion is that the ALJ did not err by finding that Plaintiff did not meet Listing 14.02.

Listing 8.07, entitled Genetic Photosensitivity Disorders, requires the Plaintiff show that

she has extensive skin lesions that have lasted or can be expected to last for a continuous period of 12 months or an inability to function outside of a highly protective environment for a continuous period of at least 12 months. "Inability to function outside of a highly protective environment" means a person "must avoid exposure to ultraviolet light, wear protective clothing and eyeglasses and use opaque broad spectrum sunscreens in order to avoid skin cancer or other serious effects." The predominant feature of Plaintiff's Lupus impairment is evaluated in accordance with the criteria established in Listing 14.02. The predominant effect of Plaintiff's Lupus is sensitivity to ultraviolet light and natural sunlight. The effect upon other body systems was not severe, although to be fair, it was broad-based. Plaintiff did, from time to time, suffer from joint pain and still does. She has had low grade fevers and small blisters on her palms, fingers and toes. She has had episodes of fatigue and still does. Her rheumatologist has described her impairment as a mild case of Lupus and no medical expert has assessed the residual functional impairment resulting from the disease. We do not believe the ALJ unreasonably found that Plaintiff failed to meet either Listing.

The second Statement of Error is based on the VE's testimony that if it were factual that Plaintiff needed to elevate her legs to waist level every 20 minutes, competitive employment would be precluded. The VE also conceded that if Plaintiff had Lupus flare-ups on a monthly basis, and that if hand blisters lasting for 1-6 weeks resulted from the Lupus flare-ups, Plaintiff would be unemployable. The VE also testified that given the time Plaintiff had to visit the hospital and her doctor's office for medical appointments over-night stays and emergency room visits, sustained employment to the level expected by most employers would be precluded. The VE further testified that most employers would not tolerate an absentee rate in excess of 3 days per month.

While we find some of the VE's responses to be based on assumptions that were inconsistent with the facts, we do believe that the sheer number of symptoms experienced by Plaintiff, some more severe than others to be sure, did support her lawyer's argument that she would have an attendance problem, especially with a disease like Lupus, where the onset of symptomatology is uncertain and based on such unpredictable considerations as the distance from an ultraviolet or natural sunlight source, the intensity of the rays, the length of the time of

exposure, the effectiveness of the blocking agent, whether it be film, sunscreen, shades or sunglasses and the fact that most of these factors are in the control of the employer, whose likelihood to accommodate a person with special needs, such as Plaintiff, is itself, unpredictable. We find the ALJ's resolution of the sustainability-of-work issue to be both erroneous and prejudicial. A mild case of Lupus in the life of Jodi Osborn is a major obstacle to sustained employment.

## CONCLUSION

Although we find that Plaintiff did not meet either of the Listings she cited, we also find that substantial evidence indicates that the sheer number of her symptoms and the rate at which she found it necessary to consult physicians and be hospitalized, in emergency rooms and otherwise, supported the expert testimony of Dr. George Parsons, Ph.D., that she would likely miss more than three days per month or have an unacceptable rate of attendance and therefore be unemployable for the closed period from May 4, 2004 to September 9, 2007. A remand in this matter would merely involve the presentation of cumulative evidence and would serve no useful purpose. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985). Accordingly, this matter should be remanded for an award of benefits for a closed period from May 2, 2004 through September 9, 2007.

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED pursuant to Sentence Four of 42 U.S.C. § 405(g) consistent with this opinion and REMANDED for an award of benefits

August 18, 2010

Timothy S. Hogan
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING THE FILING
## OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), within fourteen (14) days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

J:\HOGANTS\osborn.wpd